# Exhibit A

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TEXAS
MARSHALL DIVISION

| | | |
|---|---|---|
| NETLIST, INC. | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| SAMSUNG ELECTRONICS CO., LTD., | ) | |
| SAMSUNG ELECTRONICS AMERICA, | ) | |
| INC., SAMSUNG SEMICONDUCTOR, | ) | Case No. 2:26-cv-441 |
| INC., | ) | |
| | ) | JURY TRIAL DEMANDED |
| Defendants. | ) | (Lead Case) |
| | ) | |

## COMPLAINT

1.      Plaintiff Netlist, Inc. ("Netlist"), by its undersigned counsel, brings this Complaint against Defendants Samsung Electronics Co., Ltd. ("SEC"), Samsung Electronics America, Inc. ("SEA"), and Samsung Semiconductor, Inc. ("SSI") (collectively, "Samsung" or "Defendants") for infringement of U.S. Patent No. 12,646,537 ("the '537 Patent"). In addition, Netlist seeks a declaration that it has not breached any contractual obligation to Samsung, including obligations to license the '537 Patent to Samsung and its affiliates on reasonable and non-discriminatory ("RAND") terms.

## I.      THE PARTIES

2.      Plaintiff Netlist is a corporation organized and existing under the laws of the State of Delaware, having a principal place of business at 111 Academy Way, Suite 100, Irvine, CA 92617.

3.      On information and belief, SEC is a corporation organized and existing under the laws of the Republic of Korea, with its principal place of business at 129 Samsung-ro, Yeongtong-

gu, Suwon, Gyeonggi-Do, 443-742, Republic of Korea.  On information and belief, SEC is the worldwide parent corporation for SEA and SSI, and is responsible for the infringing activities identified in this Complaint.  On information and belief, SEC's Device Solutions division is involved in the design, manufacture, use, offering for sale and/or sales of certain semiconductor products, including the Accused Instrumentalities as defined below.  On information and belief, SEC is also involved in the design, manufacture, and provision of products sold by SEA.

4.      On information and belief, SEA is a corporation organized and existing under the laws of the State of New York.  On information and belief, SEA, collectively with SEC, operates the Device Solutions division, which is involved in the design, manufacture, use, offering for sale and/or sales of certain semiconductor products, including the Accused Instrumentalities as defined below.  Defendant SEA maintains facilities at 6625 Excellence Way, Plano, Texas 75023.  SEA may be served with process through its registered agent for service in Texas: CT Corporation System, 1999 Bryan Street, Suite 900, Dallas, Texas 75201.  SEA is a wholly owned subsidiary of SEC.

5.      On information and belief, SSI is a corporation organized and existing under the laws of the State of California.  On information and belief, SSI, collectively with SEC, operates the Device Solutions division, which is involved in the design, manufacture, use, offering for sale and/or sales of certain semiconductor products, including the Accused Instrumentalities as defined below.  On information and belief, Defendant SSI maintains facilities at 6625 Excellence Way, Plano, Texas 75023.  Defendant SSI may be served with process through its registered agent National Registered Agents, Inc., 1999 Bryan St., Ste. 900, Dallas, TX 75201-3136.  On information and belief, SSI is a wholly owned subsidiary of SEA.  *See Samsung Electronics Co., Ltd., v. Netlist, Inc.*, No. 1:25-cv-626 (D. Del.), Dkt. 5 (Samsung's corporate disclosure statement providing that "SSI is a wholly-owned subsidiary of SEA").

6.      On information and belief, Samsung has used, sold, or offered to sell products and services, including the Accused Instrumentalities, in this judicial district.

## II.      **JURISDICTION AND VENUE**

7.      Subject matter jurisdiction is based on 28 U.S.C. § 1338, in that this action arises under federal statute, the patent laws of the United States (35 U.S.C. §§ 1, *et seq.*). While supplemental jurisdiction would not independently exist over the state law breach of contract claim (Second Claim for Relief) raised against Samsung herein, under Samsung's repeated view, supplemental jurisdiction under 28 U.S.C. § 1367 exists over its own breach of contract claim when paired with a declaratory judgment claim of non-infringement of the same patent. *See Samsung Elec. Co. v. Netlist, Inc.*, C.A. No. 1:21-cv-1453 (D. Del.). D.I. 1, ¶ 8 ("The breach of contract claim forms part of the same case or controversy as the claims for declaratory judgment of non-infringement and unenforceability asserted by Samsung in this action."); *Samsung Elec. Co. v. Netlist, Inc.*, C.A. No 23-1122 (D. Del.). D.I. 1, ¶ 9 (same); *Samsung Elec. Co. v. Netlist, Inc.*, C.A. No 24-614 (D. Del.). D.I. 15, ¶ 9 (same); *Samsung Elec. Co. v. Netlist, Inc.*, C.A. No. 25-1371 (D. Del.), D.I. 1. ¶ 9 (same).  Thus, to the extent Samsung is correct, then this Court has supplemental jurisdiction over this declaratory judgment claim.

8.      Each Defendant is subject to this Court's personal jurisdiction consistent with the principles of due process and/or the Texas Long Arm Statute.

9.      Personal jurisdiction exists generally over the Defendants because each Defendant has sufficient minimum contacts and/or has engaged in continuous and systematic activities in the forum as a result of business conducted within the State of Texas and the Eastern District of Texas. Personal jurisdiction also exists over each Defendant because each, directly or through subsidiaries, makes, uses, sells, offers for sale, imports, ships, distributes, advertises, makes available, and/or markets products within the State of Texas and the Eastern District of Texas that

infringe one or more claims of the '537 Patent.  Further, on information and belief, Defendants have placed or contributed to placing infringing products into the stream of commerce, both directly and through intermediaries (including distributors, retailers, authorized dealers, sales agents, and other individuals or entities), knowing or understanding that such products would be sold and used in the United States, including in this District. Moreover, Samsung has admitted that its other similar breach of contract claims arise directly out of Netlist's "assertions of patents." *Samsung Elec. Co. v. Netlist, Inc.*, C.A. No. 1:25-cv-1589 (D. Del.), D.I. 10-1. ¶ 19; *Samsung Elec. Co. v. Netlist, Inc.*, C.A. No. 1:25-cv-1371 (D. Del.), D.I. 1. ¶ 2. Samsung specifically points to Netlist's assertions in the Eastern District of Texas for its own breach of contract claim. C.A. No. 1:25-cv-1589, ¶¶ 205, 212; C.A. No. 1:25-cv-1371 (D. Del.), D.I. 1. ¶ 118. This District and Texas is thus intertwined with this dispute between Netlist and Samsung.  And Samsung purposefully availed itself of the protections of the laws of Texas and within this District by participating in those lawsuits underlying its breach of contract claims.

10.     Venue is proper in this Court pursuant to 28 U.S.C. §§ 1391(b) and (c) and/or 1400(b).  Generally, venue is also proper in this District under 28 U.S.C. § 1391(b)–(c) because Defendants are all subject to personal jurisdiction in this District. In addition, under Section 1391(b)(3), Samsung has taken the position that there is no venue where "all necessary parties" can all be sued together for infringement and that SSI, SEA, and Netlist are all indispensable. *Samsung Elec. Co. v. Netlist, Inc.*, C.A. No. 25-626 (D. Del.)., D.I. 15 at 1-2, 9-10. Venue is also proper for Samsung because Samsung maintains a regular and established place of business in this District.  For instance, SEC maintains a regular and established place of business in this judicial district at 6625 Excellence Way, Plano, Texas 75023 and has committed acts of infringement in this judicial district.  As another example, SEA maintains a regular and established place of business in this judicial district at 6625 Excellence Way, Plano, Texas 75023 and has committed

acts of infringement in this judicial district.  Venue is also proper for SSI because it maintains a regular and established place of business in this judicial district at 6625 Excellence Way, Plano, Texas 75023 and has committed acts of infringement in this judicial district.

11.    Therefore, Samsung has offered to sell, has sold, and has intentionally and voluntarily placed infringing products into the stream of commerce with the expectation and understanding that those products will be sold, purchased, and/or used by its customers in the State of Texas, including the Eastern District of Texas.

12.    Samsung has attempted to contest venue in this District in a recent patent infringement case involving Samsung's HBM products, but despite refusing Netlist's attempts to engage in venue discovery, Samsung's motion disputing venue was rendered moot before that case was stayed.  *See Netlist, Inc. v. Samsung Elecs. Co., Ltd.*, No. 2:25-cv-00557, Dkts. 160, 166 (E.D. Tex. Mar. 2, 2026).  Prior to that, Samsung did not contest venue in multiple actions between the parties in this District.  *See Netlist, Inc. v. Samsung Elecs. Co. Ltd.*, No. 2:21-cv-463 (E.D. Tex.) ("*Samsung I*" or "*EDTX I*"), *Netlist, Inc. v. Samsung Elecs. Co. Ltd.*, No. 2:21-cv-293 (E.D. Tex.) ("*Samsung II*" or "*EDTX II*").  To any extent that SEA alleges that it has not committed acts of infringement within this Eastern District of Texas under Section 1400(b) because it has no involvement with the Accused Instrumentalities or Samsung's HBM products, a jury has also already found that SEA infringed the '060 and '160 Patents based on its HBM products. On information and belief and to any extent SSI alleges that 6625 Excellence Way, Plano Texas 75023 is not its regular and established place of business under Section 1400(b), SSI (along with SEC) has ratified this location as a regular and established place of business and, in addition, SEC, SSI, and SEA have sufficiently disregarded corporate formalities or work so closely together to treat them as one for venue purposes. For instance, Samsung uses common signage on the building at

6625 Excellence Way that does not differentiate between SEC, SSI, and SEA.  And Samsung has a unified website for SEC, SSI, and SEA as well.

## III.    FACTUAL ALLEGATIONS

### A.    Background

13.    Since its founding in 2000, Netlist has been a leading innovator in high-performance memory module technologies.  Netlist designs and manufactures a wide variety of high-performance products for the cloud computing, virtualization and high-performance computing markets.  Netlist's technology enables users to derive useful information from vast amounts of data in a shorter period of time.  These capabilities will become increasingly valuable as the volume of data continues to dramatically increase.  Netlist has secured multiple jury verdicts confirming the commercial success of its inventions.  For example, in 2023, a jury in the Eastern District of Texas found that Samsung willfully infringed five Netlist patents and awarded Netlist $303.15 million in damages.  *See Netlist, Inc. v. Samsung Elecs. Co., Ltd.*, No. 2:21-cv-463, Dkt. 479.  As another example, in 2024, a jury in the Eastern District of Texas awarded Netlist $445 million in damages against Micron, another dominant memory module manufacturer.  *See Netlist, Inc. v. Micron Technology Texas, LLC*, No. 2:22-cv-294, Dkt. 135.  And in November 2024, a jury in the Eastern District of Texas found that Samsung willfully infringed three other Netlist patents and awarded Netlist $118 million in damages.  *See Netlist, Inc. v. Samsung Elecs. Co., Ltd.*, No. 2:22-cv-293, Dkt. 847.

14.    Netlist has a long history of being the first to market with disruptive new products such as the first load-reduced dual in-line memory module ("LR-DIMM"), HyperCloud®, based on Netlist's distributed buffer architecture later adopted by the industry for DDR4 LRDIMM.  Netlist was also the first to bring NAND flash to the memory channel with its NVvault® NVDIMM.  Netlist's pioneering NVDIMM products utilized the same on-module power

management technology found on newer-generation DDR5 DIMMs. These innovative products built on Netlist's early pioneering work in areas such as embedding passives into printed circuit boards to free up board real estate, doubling densities via quad-rank double data rate (DDR) technology, and other off-chip technology advances that result in improved performance and lower costs compared to conventional memory.

15. In many commercial products, a memory module is a printed circuit board that contains, among other components, a plurality of individual memory devices (such as DRAMs). The memory devices are typically arranged in "ranks," which are accessible by a processor or memory controller of the host system. A memory module is typically installed into a memory slot on a computer motherboard.

16. Memory modules are designed for, among other things, use in servers such as those supporting cloud-based computing and other data-intensive applications. Memory modules are typically characterized by, among other things, the generation of DRAM on the module (*e.g.*, DDR5, DDR4, DDR3) and the type of module (*e.g.*, RDIMM, LRDIMM).

**B.       The '537 Patent**

17. The '537 Patent is entitled "Memory Package Having Stacked Array Dies and Reduced Driver Load," and was filed on May 19, 2025 and assigned to Netlist, Inc. The '537 Patent received a notice of allowance on April 8, 2026, issued on June 2, 2026, and claims priority to, among others, U.S. Application No. 13/288,850, filed November 3, 2011, now U.S. Patent No. 8,787,060 (the '060 Patent), and U.S. Provisional No. 61/409,893, filed November 3, 2010.

18. Claim 1 of the '537 Patent provides:

**[1pre]** A dynamic random access memory (DRAM) package, comprising:

**[1a]** an interface including terminals;

**[1b]** stacked DRAM dies, including a first plurality of DRAM dies and a second plurality of DRAM dies;

**[1c]** a control die coupled between the stacked DRAM dies and the interface; and

**[1d]** die interconnects, each of the die interconnects including through silicon vias (TSVs) through at least some of the stacked DRAM dies;

**[1e]** wherein: the DRAM package is configured to receive/output data signals via the interface in response to command/address (C/A) signals received via the interface;

**[1f]** each DRAM die of the stacked DRAM dies includes C/A ports and data ports, and is configurable to receive/output data signals via the data ports in response to C/A signals received via the C/A ports;

**[1g]** the die interconnects include first die interconnects, the first die interconnects include first C/A interconnects and first data interconnects, the first C/A interconnects are configured to conduct C/A signals from the control die to the first plurality of DRAM dies and the first data interconnects are configured to conduct data signals between the control die and the first plurality of DRAM dies;

**[1h]** the die interconnects further include second die interconnects, the second die interconnects include second C/A interconnects and second data interconnects, the second C/A interconnects are configured to conduct C/A signals from the control die to the second plurality of DRAM dies, and the second data interconnects are configured to conduct data signals between the control die and the second plurality of DRAM dies;

**[1i]** the first plurality of DRAM dies are configured to not receive or output any signals via any of the second die interconnects;

**[1j]** the second plurality of DRAM dies are configured to not receive or output any signals via any of the first die interconnects;

**[1k]** the control die includes signal conduits, and each signal conduit is coupled between a die interconnect of the die interconnects and a terminal of the terminals;

**[1l]** the signal conduits include first data conduits coupled to respective die interconnects of the first data interconnects, and second data conduits coupled to respective die interconnects of the second data interconnects;

**[1m]** the first data conduits and the second data conduits are configurable to concurrently drive respective data signals to respective die interconnects of the first data interconnects and the second data interconnects;

**[1n]** the signal conduits further include first C/A conduits coupled to respective die interconnects of the first C/A interconnects, and second C/A conduits coupled to respective die interconnects of the second C/A interconnects; and

**[1o]** the first C/A conduits and the second C/A conduits are configurable to concurrently drive respective C/A signals to respective die interconnects of the first C/A interconnects and the second C/A interconnects.

**C.      Defendants' Infringing Activities**

19.     Samsung is a global technology company and one of the largest manufacturers of semiconductor memory products such as DRAM, NAND Flash, and MCP (Multi-Chip Package) such as high-bandwidth memories ("HBM").  Samsung develops, manufactures, sells, offers to sell, and imports into the United States memory components and memory modules designed for, among other things, use in servers such as those supporting cloud-based computing and other data-intensive applications.

20.     Samsung and Netlist were initially partners under a 2015 Joint Development and License Agreement ("JDLA"), which granted Samsung a 5-year paid-up license to Netlist's patents "having an effective first filing date on or prior to" November 12, 2020. *See Netlist Inc. v. Samsung Elecs. Co., Ltd.*, No. 20-cv-993, Dkt. 186 at 20-21 (C.D. Cal. Oct. 14, 2021).  On information and belief, Samsung used Netlist's technologies to develop products both in the mature markets such as DDR4 memory modules and the emerging market for new generations of DRAM technologies, including DDR5 and HBMs.  Under the JDLA, Samsung was obligated to supply Netlist certain memory products at competitive prices.  Samsung, however, did not honor its promises and repeatedly failed to fulfill Netlist's product orders.  As a result, Netlist terminated the JDLA on

July 15, 2020, which termination was found effective on summary judgment by a federal district court in the Central District of California on October 14, 2021. *Id.*

21.   Samsung appealed this decision, and the Ninth Circuit partially reversed the summary judgment ruling. Following remand, the contract action in C.D. Cal. proceeded to a jury trial. On May 17, 2024, the jury returned a verdict finding that Netlist's interpretation of the JDLA's supply provision was correct, and Samsung's breach of that provision was material. On December 26, 2024, the Court granted Samsung's motion for a new trial, and a new trial was held on March 18-21, 2025. On March 24, 2025, the jury returned a verdict for Netlist. As a result of this jury verdict, Samsung's license to Netlist's patents was terminated on July 15, 2020.

22.   In April 2023, a jury in the Eastern District of Texas found that Samsung willfully infringed five Netlist patents and awarded Netlist $303.15 million in damages, including $122,775,000 for U.S. Patent Nos. 8,787,060 and 9,318,160—asserted against Samsung's HBM products, and $147,225,000 for U.S. Pat. Nos. 11,016,918 and 11,232,054—asserted against Samsung's DDR5 memory modules. And in November 2024, a jury found that Samsung willfully infringed three different Netlist patents and awarded Netlist $118 million in damages. *See Netlist, Inc. v. Samsung Elecs. Co., Ltd.*, No. 2:22-cv-293, Dkt. 847.

**D.    High Bandwidth Memory ("HBM")**

23.   HBM is a type of high-speed computer memory technology that relies in part on vertically-stacked memory dies and differs from the DDR4 or DDR5 DIMM formats described in the paragraphs above. On information and belief, Samsung is a major supplier of HBM.

24.   On information and belief, the Accused HBM Products include, without limitation, any Samsung HBM2, HBM2E, HMB3, HBM3E, HBM4 and newer products (*e.g.*, HBM4E; HBM5) made, sold, used, offered for sale, and/or imported into the United States by Samsung. By way of non-limiting example, the accused HBM products include Samsung products marketed as

"Aquabolt," "Flashbolt," "Icebolt" or "Shinebolt."  In March 2026, Samsung "unveiled its HBM4E chip and HBM5 architecture for the first time," and explained it "plans to apply the same core die and base die structure used in previous model(HBM4E)[.]"[1]: "A version of Samsung Electronics' (005930.KS), fifth-generation high bandwidth memory (HBM) chips, or HBM3E, has passed Nvidia's (NVDA.O) tests for use in its artificial intelligence (AI) processors."[2]

25.     On information and belief, the Accused HBM Products are compliant with the applicable memory standards promulgated by the Joint Electron Device Engineering Council ("JEDEC").

26.     On information and belief, Samsung's HBM products are comprised of stacked dies interconnected by through silicon vias ("TSVs"), as shown on Samsung's website.[3]

**What does an HBM package look like? What is the typical size?**

High Bandwidth Memory (HBM) consists of multiple memory dies stacked vertically and interconnected through TSVs (Through-Silicon Vias).

The package is typically a thin, nearly square unit of around 1–2 cm² in area and approximately 1 mm thick, with thickness depending on the number of stacked dies.

---

[1] https://semiconductor.samsung.com/news-events/tech-blog/architecting-the-ai-era-samsung-electronics-and-nvidia-define-the-future-at-gtc-2026/.

[2] https://www.reuters.com/technology/artificial-intelligence/samsungs-8-layer-hbm3e-chips-clear-nvidias-tests-use-sources-say-2024-08-06/

[3] https://semiconductor.samsung.com/dram/hbm/; https://semiconductor.samsung.com/news-events/tech-blog/leading-memory-innovation-with-hbm3e/; https://semiconductor.samsung.com/news-events/news/samsung-ships-industry-first-commercial-hbm4-with-ultimate-performance-for-ai-computing/.

**Stacking the Chips and Packaging**
The strategic stacking of 12 layers of 24Gb DRAM chips using Through-Silicon Via (TSV) technology gives the HBM3E astounding bandwidth and an industry-leading 36GB of capacity per layer. This scheme improves capacity by 50% over its 12-layer HBM3 predecessor. The HBM3E and HBM3 chip sizes are compatible with each other, allowing easy transfer of hardware layouts from HBM3 to HBM3E.

### E.    Compliance with Contract and Competition Law

27.    Samsung has a history of filing retaliatory litigation against Netlist alleging that Netlist's patents are standard essential ("SEPs") under JEDEC, and Netlist has allegedly failed to license these patents on reasonable and non-discriminatory ("RAND") terms. Based on these allegations, Samsung has brought suit against Netlist for breach of contract, violations of Section 2 of the Sherman Antitrust Act, and violation of California's Unfair Competition Law ("UCL").

28.    On September 30, 2025, Netlist brought a complaint under Section 337 of the Tariff Act of 1930 against Samsung in the United States International Trade Commission ("USITC") alleging infringement of various Netlist patents. *Certain Dynamic Random Access Memory (DRAM) Devices, Products Containing the Same, and Components Thereof,* Inv. No. 337-TA-1472 ("USITC Compl."). Netlist's complaint expressly alleged that the asserted patents were not standard essential. USITC Compl. ¶ 20 ("Netlist is not relying on essentiality to the standard to establish infringement by the proposed Respondents. In particular, the JEDEC standard does not require all limitations of any one of the Asserted Claims. Accordingly, none of the Asserted Claims is standard-essential.").

29.    Despite this, Samsung filed counterclaims, which it subsequently removed to the United States District Court for District of Delaware pursuant 19 U.S.C. § 1337(c) and 19 C.F.R. § 210,149(e), alleging the following: "Although Netlist asserts alleged SEPs in [the USITC] action, Netlist has not made a RAND offer, in violation of its RAND commitment to all JEDEC members. Through this and other conduct described in more detail below, Netlist has violated

and/or attempted to violate Section 2 of the Sherman Act, breached its contractual obligations owed to Samsung, and engaged in unfair competition in violation of California Business and Professions Code § 17200 et seq." *Samsung Electronics Co., LTD., v. Netlist, Inc.,* 1:25-cv-01589-UNA (D. Del., Dec. 31, 2025), Dkt. 1-1 ¶¶ 11-12.

30. Samsung has unsuccessfully made similar arguments alleging the same facts previously before this Court.

31. For example, Samsung asserted defenses of laches, estoppel, and/or waiver, and inequitable conduct, in Case Nos. 2:21-cv-00463 ("EDTX I") and 2:22-cv-00293 ("EDTX II") for Netlist's alleged noncompliance with RAND obligations and with JEDEC's disclosure obligations, and for Netlist's alleged failure to disclose JEDEC prior art in patent prosecution. See Answer to First Am. Compl. at 39, 44–51, EDTX I, No. 2:21-cv-00463 (E.D. Tex. May 18, 2022), Dkt. No. 25; Answer to Third Am. Compl. at 22–23, 28–44 EDTX II, No. 2:22-cv-00293 (E.D. Tex. Sept. 11, 2023), Dkt. No. 145.

32. The JEDEC Patent Policy obligates licensing only "Essential Patent Claims" on RAND terms. JEDEC defines "Essential Patent Claims" as claims that "would necessarily be infringed by" complying with "a final approved JEDEC standard." In other words, only patent claims that are actually essential to a JEDEC standard must be licensed on RAND terms.

33. Samsung conceded in EDTX I that none of the patents-in-suit were standard essential. EDTX I, Dkt. 427 (PTC Tr.), at 146:1-7, 192:22-24, and 193:6-10; see also id., at 147:1-6 ("[The Court: there are no standard essential patents, there's no third-party beneficiary enforcement of a RAND obligation, and that largely negates the relevance of JEDEC."); see also EDTX II, Dkt. 818 at 2 (E.D. Tex. Nov. 6, 2024) ("The Parties stated on the record that … the ''608 Patent' … [is] not standard essential …."). As this Court further previously found, "[a]t the time of trial, Netlist asserted infringement based on a comparison of the claims of the asserted

patents to Samsung's accused products," not the JEDEC standard. EDTX I, Dkt. 550, at 25. Compliance with JEDEC standards is immaterial to Samsung's infringement of Netlist's patents.

34. Samsung's repeatedly claimed that the parents of the patent-in-suit are not standard essential. Samsung's repeatedly claimed that it does not infringe Netlist's parent patents through Samsung's design, manufacture, use, importation, offering for sale, and/or sales of certain semiconductor products including the Accused Instrumentalities and related products, which are JEDEC standard compliant, meaning there is no RAND obligation if the parent patents are not infringed. On information and belief, Samsung also claims it does not infringe the patent-in-suit.

35. Netlist has complied with all RAND obligations regardless of whether its patent is essential.

36. Even if Samsung had a right to a RAND license to Netlist's patents, those rights were eliminated by Samsung's bad faith, including its material breach of the JDLA and its willful infringement of Netlist's patents.

37. Samsung has been found in material breach of the JDLA, thus eliminating any right Samsung would have had to a RAND license, if one existed. See Verdict Form, *Netlist, Inc. v. Samsung Elecs. Co.*, No. 20-cv-993 (C.D. Cal. May 17, 2024), Dkt. No. 556.

38. Samsung is an adjudicated willful infringer of a number of Netlist's patents, including two parent patents to the '537 Patent. See Verdict Form, *Netlist, Inc. v. Samsung Elecs. Co.*, No. 2:21-cv-463 (E.D. Tex. Apr. 21, 2023), Dkt. No. 479.

39. Therefore, Samsung lost any right to have a RAND license to Netlist's patents, if a right ever existed.

40. On information and belief, because Samsung maintains the patent-in-suit is not essential to any JEDEC standard, Netlist had no obligation to disclose either patent to JEDEC or its members. Cf. Order on Pretrial Motions, EDTX I, No. 2:21-cv-00463 (E.D. Tex. Apr. 5, 2023),

Dkt. No. 432 (granting Netlist's motion in limine to "[p]reclude Samsung from presenting any allegations that Netlist has failed to comply with JEDEC obligations").

41.     The Court has rejected Samsung's equitable defenses arising from these same facts. See Memorandum Opinion and Order, EDTX I, No. 2:21-cv-00463 (E.D. Tex. Aug. 11, 2023), Dkt. No. 550; cf. Final Judgment, EDTX II, No. 2:22-cv-00293 (E.D. Tex. Dec. 2, 2024), Dkt. No. 855.

42.     Any coercive claims relating to the above are compulsory and must be brought by Samsung in this action

## IV.     FIRST CLAIM FOR RELIEF – '537 Patent

43.     Netlist re-alleges and incorporates by reference the allegations of the preceding paragraphs of this Complaint as if fully set forth herein.

44.     On information and belief, Samsung directly infringed and is currently infringing at least one of the approved claims of the '537 Patent by, among other things, making, using, selling, offering to sell, and/or importing within this District and elsewhere in the United States, without authority, the Accused HBM Products, and other products with materially the same structure in relevant part.  For example, and as shown below, the Accused HBM Products and other products with materially the same structure and operating mechanisms in relevant part infringe at least Claim 1 of the '537 Patent.

45.     To the extent the preamble is limiting, the Accused HBM Products each include a dynamic random access memory (DRAM) package.  On information and belief, the Accused HBM Products each include an interface with terminals, stacked DRAM dies (*e.g.*, 8, 12, or 16 DRAM dies) including at least a first plurality and second plurality of DRAM dies, a control die (*e.g.*, a "buffer die," "logic die," or "base die") coupled between the stacked DRAM dies and the interface, and die interconnects that include through silicon vias (TSVs) through at least some of the stacked

- 15 -

DRAM dies. For example, the core dies in the HBMs comprise DRAM cells and are therefore DRAM dies, and the HBM's core dies can be divided into multiple die groups.

*See also* https://semiconductor.samsung.com/dram/hbm/:

# The forefront high-bandwidth memory for hyperscale AI training workloads

Samsung HBM (High Bandwidth Memory) integrates advanced TSV-based stacking with high-throughput memory performance to accelerate AI training and HPC workloads. Designed for data-intensive and highly parallel operations, the HBM family delivers the ultra-fast, seamless data movement needed to power next-generation AI infrastructure. With its stacked architecture and wide interface, Samsung HBM improves system-level efficiency across the industry's most complex workloads.

*See also* https://news.samsungsemiconductor.com/global/video-the-hbm4-infographic-key-specs-and-performance-leap/:





*See also* https://semiconductor.samsung.com/news-events/tech-blog/autonomous-driving-and-the-modern-data-center/:

High Bandwidth Memory (HBM) is ideally suited for AI applications. HBM employs stacks of vertically interconnected DRAM chips, supports 1,024 I/Os and implements Through Silicon Via (TSV) technology, where connections between die are achieved through thousands of copper-filled holes functioning as wires with alternating layers of external microbumps.



Source:Samsung

- 17 -

*See also Supercharge Your Applications with Samsung High Bandwidth Memory*, Samsung, at 4 (2018):



*See also* "Design of Non-Contact 2Gb/s I/O Test Methods for High Bandwidth Memory (HBM)" (available at https://ieeexplore.ieee.org/document/7844162):



Fig. 8  8-H Cross section and buffer die microphotograph.

*See also* ISSCC 2016 Paper:[4]

---

[4] https://ieeexplore.ieee.org/stamp/stamp.jsp?tp=&arnumber=7418034



**Figure 18.2.1: HBM system, various stack configurations and buffer die architecture.**

46.    For example, as illustrated below, each of the Accused Instrumentalities includes stacked memory dies (*e.g.*, 4-16 stacked DRAM dies), including a first plurality of memory dies (*e.g.*, a set of dies communicating through a same (first) data channel, such as dies 1 and 5, dies 2 and 6, dies 3 and 7, or dies 4 and 8) and a second group of at least one DRAM die (*e.g.*, another set of dies communicating through a second data channel); or for HBM2 and HBM2E, all odd numbered dies form a first plurality of DRAM dies and all even numbered dies form a second plurality of the DRAM dies.



Twist (HBM2 and HBM2E)    Spiral (HBM3)

Animation based on JTX0015-0001    Animation based on JTX0015-0002

(IPR2022-01427, Exs. 2029, 2030)

47.    On information and belief, the Accused HBM Products are configured to receive or output data signals via the interface in response to command/address (C/A) signals received via the interface. For example, as shown below, the terminals may be located in the PHY region, as well as the direct access and other testing region of the Accused HBM Products:



48.    By way of further example, a READ or WRITE command is triggered by C/A signals received on the appropriate terminals, and in response to the received READ or WRITE

commands received via the interface, the DRAM package is configured to receive/output data signals via the interface's data terminals. *See* JESD238A (JEDEC HBM4 Standard):

#### 6.3.1 Command Truth Tables (cont'd)

Table 31 — Column Commands Truth Table

| Command [4] | Symbol | Clock Cycle | C0 | C1 | C2 | C3 | C4 | C5 | C6 | C7 | Notes |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Column No Operation | CNOP | R | H | H | H | V | V | V | V | V | 1, 2, 3 |
| | | F | V | V | V | V | V | V | V | V | |
| Read | RD | R | H | L | H | L | PC | SID0 /V | SID1 /V | BA0 | 1, 2, 3, 5, 6, 7 |
| | | F | BA1 | BA2 | BA3 | CA0 | CA1 | CA2 | CA3 | CA4 | |
| Read w/ AP | RDA | R | H | L | H | H | PC | SID0 /V | SID1 /V | BA0 | 1, 2, 3, 5, 6, 7 |
| | | F | BA1 | BA2 | BA3 | CA0 | CA1 | CA2 | CA3 | CA4 | |
| Write | WR | R | H | L | L | L | PC | SID0 /V | SID1 /V | BA0 | 1, 2, 3, 5, 6 |
| | | F | BA1 | BA2 | BA3 | CA0 | CA1 | CA2 | CA3 | CA4 | |
| Write w/ AP | WRA | R | H | L | L | H | PC | SID0 /V | SID1 /V | BA0 | 1, 2, 3, 5, 6 |
| | | F | BA1 | BA2 | BA3 | CA0 | CA1 | CA2 | CA3 | CA4 | |
| Mode Register Set | MRS | R | L | L | L | MA4 | OP5 | OP6 | OP7 | MA0 | 1, 3, 8, 9 |
| | | F | MA1 | MA2 | MA3 | OP0 | OP1 | OP2 | OP3 | OP4 | |

NOTE 1  BA = Bank Address; CA = Column Address; PC = Pseudo Channel 0 or 1; SID = Stack ID; MA = Mode Register Address; V = Valid Signal (either H or L, but not floating).

NOTE 2  C[7:0] must be driven to a valid signal level even if a stack ID address (SID) is not defined for a specific density, or if parity is disabled in the mode register. APAR must be driven to a valid signal level even if CA parity is disabled in MR0 OP6. C[7:0] are Don't Care when the device is in power-down or self refresh.

NOTE 3  Parity is evaluated on all pins if CA parity is enabled in MR0 OP6.

NOTE 4  All other command encodings not shown in the table are reserved for future use.

NOTE 5  PC = 0 selects pseudo channel 0 (PC0), and PC = 1 selects pseudo channel 1 (PC1). The pseudo channel not selected by PC performs a CNOP.

NOTE 6  The SID bits act as bank address bits in conjunction with READ and WRITE commands, and related timing diagrams shall be interpreted accordingly. All other column commands do not use SID. Refer to the channel addressing table for HBM3 configurations using SID.

NOTE 7  HBM3 configurations using the SID specify a timing parameter $t_{CCDR}$ for consecutive READs to different SID. Vendor datasheets should be consulted for details.

NOTE 8  All mode registers are write-only by default using the MRS command.

NOTE 9  Refer to the HBM3 Mode Register Overview table for MA4 of MRS.



NOTE 1  BA = Bank Address; CA = Column Address; SID = Stack ID; PC = Pseudo Channel 0 or 1;
NOTE 2  EN AP = Enable Auto Precharge; DIS AP = Disable Auto Precharge

**Figure 30 — READ Command**

- 21 -



NOTE 1   BA = Bank Address; CA = Column Address; SID = Stack ID; PC = Pseudo Channel 0 or 1;
NOTE 2   EN AP = Enable Auto Precharge; DIS AP = Disable Auto Precharge

**Figure 38 — Write Command**



NOTE 1   tWDQS2DQ_O may span multiple clock periods.
NOTE 2   A burst length of 8 is shown.
NOTE 3   Early/late data transition of a DQ or SEV or ECC or DBI can vary within a burst.
NOTE 4   Da...a+7 = data-out for READ command a.
         D = last data-out from previous READ command (not if first READ after reset, MRS, self refresh or write-to-read).
NOTE 5   tWPRE2 = Read preamble for WDQS, tWPST2 = Read postamble for WDQS
NOTE 6   tRPRE = Read preamble for RDQS, tRPST = Read postamble for RDQS

**Figure 31 — Clock to RDQS and Data Out Timings**

49.    On information and belief, each DRAM die of the stacked DRAM dies in the Accused HBM Products includes C/A ports and data ports, and is configurable to receive or output data signals via the data ports in response to C/A signals received via the C/A ports. *See, e.g.,* https://semiconductor.samsung.com/news-events/tech-blog/autonomous-driving-and-the-modern-data-center/ ("HBM employs stacks of vertically interconnected DRAM chips, supports 1,024 I/Os and implements Through Silicon Via (TSV) technology, where connections between

die are achieved through thousands of copper-filled holes functioning as wires with alternating layers of external microbumps."). For example, each die interconnect illustrated below is associated with a set of drivers and receivers that are present only on some but not all DRAMs. On information and belief, such configurations apply to both AWORD (command/address) and DWORD (data) interconnects. Data signals are received or output via the data drivers/receivers on the respective DRAMs, and the C/A signals are received via the respective C/A receivers on the respective DRAMs. The data signals are output/received in response to the received C/A signals, such as those corresponding to read/write signals.

Twist (HBM2 and HBM2E)



Animation based on JTX0015-0001

Spiral (HBM3)



Animation based on JTX0015-0002

(IPR2022-01427, Exs. 2029, 2030)

- 23 -



Figure 31 — Clock to RDQS and Data Out Timings

Figure 39 — Clock to WDQS and Data Input Timings

(JESD238A (JEDEC HBM4 Standard))

*See also* ISSCC2016 at Fig. 18.2.2 (showing data input/output via the DWORD region in response to signals received in the AWORD region):



**4H & 8H Case**
**2ch/die**
**16bank/ch**

**2H Case**
**4ch/die**
**8bank/ch**

50. On information and belief, the die interconnects in the Accused HBM Products include first die interconnects, including first C/A interconnects and first data interconnects, with the first C/A interconnects configured to conduct C/A signals from the control die to the first plurality of DRAM dies, and the first data interconnects configured to conduct data signals between the control die and the first plurality of DRAM dies. Similarly, the die interconnects in the Accused HBM Products include second die interconnects, including second C/A interconnects and second data interconnects, with the second C/A interconnects configured to conduct C/A

signals from the control die to the second plurality of DRAM dies, and the second data interconnects configured to conduct data signals between the control die and the second plurality of DRAM dies.  For example, as shown above, in HBM2 and HBM2E, AWORD and DWORD interconnects adopt a twist configuration in which two interconnects associated with two different channels form a twist pair, where one interconnect in the pair is configured to conduct C/A signals and data signals between the control die and the odd dies in the DRAM stack while the second interconnect in the pair is configured to conduct C/A and data signals between the control die and the even dies in the DRAM stack. Each interconnect of the twist pair can be one first die interconnect, each first AWORD die interconnect is one first C/A interconnect and each first DQ die interconnect is one data interconnect. Likewise, in HBM3, HBM3E, HBM4 and HBM4E, AWORD and DWORD interconnects adopt a spiral configuration in which four interconnects associated with four different channels form a spiral group, where one interconnect in the group is configured to conduct C/A signals and data signals between the control die and dies {0, 4, 8, … 4n} in the DRAM stack, a second interconnect in the group is configured to conduct C/A signals and data signals between the control die and dies {1, 5, 9, … 4n+1} in the DRAM stack, a third interconnect in the group is configured to conduct C/A signals and data signals between the control die and dies {2, 6, 10, … 4n+2} in the DRAM stack, and a fourth interconnect in the group is configured to conduct C/A signals and data signals between the control die and dies {3, 7, 11, … 4n+3} in the DRAM stack.  Each interconnect of the spiral group can be one first die interconnect; each first AWORD die interconnect is one first C/A interconnect and each first DQ die interconnect is one data interconnect. Any of the interconnects in a twist pair can be a first or second die interconnect and any of the interconnects in a spiral group can be a first or second die interconnect, so long as the first and second die interconnects correspond to the different members of the pair/group.

51.     Further, the first plurality of DRAM dies in the Accused HBM Products are configured to not receive or output any signals via any of the second die interconnects, and the second plurality of DRAM dies are configured to not receive or output any signals via any of the first die interconnects. *See, e.g.*, https://semiconductor.samsung.com/us/news-events/tech-blog/the-perfect-harmony-created-by-samsung-hbm-powering-the-ai-era/ (depicting die interconnects (TSVs) that appear to only electrically interconnect to some of the dies in the stack, while others may electrically bypass certain groups of dies):



52.     As further illustrated below, the die interconnects associated with Channel A would not receive any signals from or output any signals to any of the dies labelled as "CH. F" or "CH. E," and the die interconnects associated with Channel E would not would not receive any signals from or output any signals to any of the dies labelled as "CH. A" or "CH. B." Similarly, for HBM3 and later generations, the green interconnect in the spiral group would not receive any signals from or output any signals to any of the dies with uncolored drivers/receivers:



Twist (HBM2 and HBM2E)        Spiral (HBM3)

Animation based on JTX0015-0001        Animation based on JTX0015-0002

(IPR2022-01427, Exs. 2029, 2030)

53.     On information and belief, the control die in the Accused HBM Products includes signal conduits, and each signal conduit is coupled between a die interconnect of the die interconnects (*e.g.*, one or more die interconnects) and a terminal of the terminals (*e.g.*, one or more terminals). The signal conduits further include first and second data conduits and first and second C/A conduits. First data conduits are coupled to respective die interconnects of the first data interconnects, while second data conduits are coupled to respective die interconnects of the second data interconnects, and the first and second data conduits are configurable to concurrently drive respective data signals to respective die interconnects of the first and second data interconnects. Similarly, first C/A conduits are coupled to respective die interconnects of the first C/A interconnects, while second C/A conduits are coupled to respective die interconnects of the second C/A interconnects, and the first and second C/A conduits are configurable to concurrently drive respective C/A signals to respective die interconnects of the first and second C/A interconnects. For example, as shown above, the Accused HBM Products include first and second conduits in the control die that connect to respectively the first and second die interconnects. *See*

EX2029 and EX2030 of IPR2022-1427. By way of further example, the JEDEC specification confirms that the base logic die can "provide[] signal redistribution," which implies that a conduit is placed between a terminal and a corresponding die interconnect. *See* JESD238A, at 2. Further, according to Samsung, the purpose of the logic/buffer die is to "provide routes from the TSVs related to the DRAM dies to the micro bump IOs in the PHY area" as well as to "provide functionality to system makers and DRAM vendors; DRAM tests are all executed through DA (direct access) PADs." ISSCC 2016 Paper at 316; *see also id.* at 317, Fig. 18.2.1 ("Figure 18.2.1 shows that the test block covers all of the normal paths from the PHY to the TSV for each test item."):



54.     For example, each channel of a HBM package can be accessed in parallel to provide the wide-interface architecture, in which the associated data signals and C/A are received in parallel by the respective channel. This implies that the first C/A and data conduits and the second C/A and data conduits are configurable to concurrently drive respective C/A and data signals to respective die interconnects of the first C/A and data interconnects and the second C/A and data interconnects. *See e.g.*, JESD238A (HBM3) at p. 1 ("The HBM3 DRAM is tightly coupled to the host compute die with a distributed interface.  The interface is divided into independent channels.

Each channel is completely independent of one another.  Channels are not necessarily synchronous to each other.  The HBM3 DRAM uses a wide-interface architecture to achieve high-speed, low power operation.  Each channel interface maintains a 64 bit data bus operating at double data rate (DDR)."); p. 3 ("Each channel consists of an independent command and data interface. …Each channel interface provides an independent interface to a number of banks of DRAM of a defined page size."); *see also* JESD270-4, at p. 1 ("The HBM4 DRAM is tightly coupled to the host compute die with a distributed interface.  The interface is divided into independent channels.  Each channel is completely independent of one another.  Channels are not necessarily synchronous to each other.  The HBM4 DRAM uses a wide-interface architecture to achieve high-speed, low power operation.  Each channel interface maintains a 64 bit data bus operating at double data rate (DDR)."), p. 3 ("Each channel consists of an independent command and data interface. … Channels are independently clocked, and need not be synchronous ….").

55.     On information and belief, Samsung also indirectly infringes the '537 Patent, as provided in 35 U.S.C. § 271(b), by inducing infringement by others, such as Samsung's customers and end users, in this District and elsewhere in the United States.  For example, on information and belief, Samsung has induced, and currently induces, the infringement of the '537 Patent through its affirmative acts of selling, offering to sell, distributing, and/or otherwise making available the Accused HBM Products and other materially similar products that infringe the '537 Patent.  On information and belief, Samsung provides specifications, datasheets, instruction manuals, and/or other materials that encourage and facilitate infringing use of the Accused HBM Products and other materially similar products by users in a manner that it knows or should have known would result in infringement and with the intent of inducing infringement. On information and belief, Samsung is encouraging and facilitating infringement of the '537 Patent by others. For example, on information and belief, Samsung sells or otherwise provides the Accused HBM

Products to distributors or U.S.-based sales entities knowing that these entities intend to make, use, offer to sell, and/or sell the products within the United States and/or import the products into the United States in an infringing manner.

56. On information and belief, Samsung also indirectly infringes the '537 Patent, as provided in 35 U.S.C. § 271(c), contributing to direct infringement committed by others, such as customers and end users, in this District and elsewhere in the United States. For example, on information and belief, Samsung has contributed to, and currently contributes to, Samsung's customers' and end-users' infringement of the '537 Patent through its affirmative acts of selling and offering to sell, either directly or through its distributors, in this District and elsewhere in the United States, the Accused HBM Products and other materially similar products that infringe the '537 Patent. On information and belief, the Accused HBM Products and other materially similar products have no substantial noninfringing use, and constitute a material part of the patented invention. On information and belief, Samsung is aware that the product or process that includes the Accused HBM Products and other materially similar products may be covered by one or more claims of the '537 Patent. On information and belief, the use of the product or process that includes the Accused HBM Products and other materially similar products infringes at least one claim of the '537 Patent.

57. Samsung's infringement of the '537 Patent has damaged and will continue to damage Netlist. Samsung has had actual notice of the '537 Patent and its infringement since at least the filing of this Complaint but as early as the '537 Patent issuing. Samsung's infringement of the '537 Patent has been continuing and willful. Samsung continues to commit acts of infringement despite a high likelihood that its actions constitute infringement, and Samsung knew or should have known that its actions constituted an unjustifiably high risk of infringement. Samsung has previously admitted to actively monitoring Netlist's patent applications prior to

issuance. *See, e.g.*, *Samsung Elecs. Co., Ltd. v. Netlist, Inc.*, C.A. No. 23-1122 (D. Del. July 11, 2025), Dkt. No. 30 at 5 & n.2 ("Samsung intends to file . . . a claim for declaratory judgment of non-infringement of any patent that issues from [Netlist's] '017 application in this Court"; "Samsung intends to seek a declaratory judgment of non-infringement of any patent that issues from [Netlist's] '797 application in this Court."). On information and belief, Samsung was previously aware of U.S. Patent Application No. 19/212,638 even before the '537 Patent issued.

## V.  SECOND CLAIM FOR RELIEF – Declaratory Judgment of No Breach of RAND Obligations

58.  Netlist re-alleges and incorporates by reference the allegations of the preceding paragraphs of this Complaint as if fully set forth herein.

59.  Based on Samsung's established practice of alleging that Netlist has breached its RAND obligations and filing retaliatory claims on this basis, there exists a substantial controversy between Netlist and Samsung as to whether Netlist has breached its commitment under JEDEC.

60.  Any allegation that Netlist has breached any RAND obligation under JEDEC's Patent Policy for the '537 Patent is barred by the statute of limitations.

61.  Netlist cannot have breached its RAND obligations given that (1) Netlist granted Samsung a license in the form of the JDLA, (2) Samsung has never argued this license was not RAND compliant, and (3) the reason why this license is no longer in effect is because of Samsung's own material breach as determined by the Central District of California. Netlist discharged its RAND obligation by offering a patent license to Samsung that Samsung, not Netlist, chose to breach.

62.  Netlist has also not breached any RAND obligation under JEDEC's Patent Policy, which only applies to "Essential Patent Claims." JEDEC Manual No. 21T § 8.2.4 (". . . each Committee Member . . . agrees to offer to license on RAND terms . . such Committee Member's

Essential Patent Claims . . ."); *id*. at 31 (defining "Essential Patent Claims" as "[t]hose Patent claims the use of which would necessarily be infringed by the use, sale, offer for sale or other disposition of a portion of a product in order to be compliant with the required portions of a final approved JEDEC standard").

63. The Court has recognized Netlist's patents as not standard essential. *Netlist, Inc. v. Samsung Elecs. Co.,* No. 2:21-cv-463 (E.D. Tex.), Dkt. 427 (PTC Tr.) at 146:15-22 (The Court: "[N]one of the asserted patents are standard essential, they are not encumbered with a RAND obligation"), 147:1-6 (The Court: "[T]here are no standard essential patents, there's no third-party beneficiary enforcement of a RAND obligation, and that largely negates the relevance of JEDEC."); *Netlist, Inc. v. Samsung Elecs. Co.*, No. 2:22-cv-293 (E.D. Tex.); Dkt. 818 at 2 (E.D. Tex. Nov. 6, 2024) ("The Parties stated on the record that [U.S. Patent Nos. 7,619,912, 11,093,417, and 10,268,608] … are not standard essential patents.….."). As this Court further previously found, "[a]t the time of trial, Netlist asserted infringement based on a comparison of the claims of the asserted patents to Samsung's accused products," not the JEDEC standard. *Netlist, Inc. v. Samsung Elecs. Co.,* No. 2:21-cv-463 (E.D. Tex.), Dkt. 550, at 25. Similarly, the '537 Patent is not essential to any JEDEC standard.

64. Netlist has negotiated and offered a license in compliance with RAND.

65. Samsung is not a willing licensee; rather Samsung has acted in bad faith, including materially breaching the JDLA, and willfully infringing Netlist's patents, thus eliminating any right Samsung would have had to a RAND license, if one existed.

66. Because RAND obligations do not apply to the '537 Patent, Netlist is not in breach of any RAND obligations.

67. To the extent RAND obligations do exist, Netlist has complied with all RAND obligations.

68. Any such claim is barred by the statute of limitations.

69. Accordingly, Netlist is entitled to a declaration that it has not breached any RAND obligations.

70. Samsung cannot satisfy any of the elements for such a claim.

## VI. THIRD CLAIM FOR RELIEF – Declaratory Judgment of No Unlawful Scheme to Acquire and Exploit Monopoly Power in Violation of Section 2 of the Sherman Act, 15 U.S.C. § 2

71. Netlist re-alleges and incorporates by reference the allegations of the preceding paragraphs of this Complaint as if fully set forth herein.

72. Based on Samsung's established practice of alleging that Netlist has breached its RAND obligations and filing retaliatory claims on this basis, there exists a substantial controversy between Netlist and Samsung as to whether Netlist has engaged in an unlawful scheme to acquire and exploit monopoly power in violation of Section 2 of the Sherman Act.

73. Netlist denies that any anti-trust markets exist for anti-trust purposes as it relates to Netlist's actions ("Relevant Markets").

74. To the extent any Relevant Markets exist, Netlist has no market power in any Relevant Markets. Netlist and Samsung have repeatedly asserted that Netlist patents are not essential to any JEDEC Standard. Indeed, Samsung conceded in *EDTX I* that none of the patents-in-suit were standard essential. *EDTX I*, Dkt. 427 (PTC Tr.), at 146:1-7, 192:22-24, and 193:6-10; *see also id*., at 147:1-6 ("[The Court: there are no standard essential patents, there's no third-party beneficiary enforcement of a RAND obligation, and that largely negates the relevance of JEDEC."); *see also EDTX II*, Dkt. 818 at 2 (E.D. Tex. Nov. 6, 2024) ("The Parties stated on the record that … the ''608 Patent' … [is] not standard essential …."). As this Court further previously

found, "[a]t the time of trial, Netlist asserted infringement based on a comparison of the claims of the asserted patents to Samsung's accused products," not the JEDEC standard. *EDTX I*, Dkt. 550, at 25. Nor are the claims of the '537 Patent essential to any JEDEC standard. Thus, Netlist could not have excluded competition much less held power to charge supra-competitive prices. As a result, Netlist has not acquired or maintained any monopoly power as a result of Netlist's involvement in JEDEC.

75.    Netlist met any JEDEC disclosure duty that existed and did not fail to disclose its patents as essential or potentially essential to JEDEC committees. There is no obligation to disclose a patent that is not standard essential. *See* JEDEC Manual No. 21T § 8.2.4 (". . . each Committee Member . . . agrees to offer to license on RAND terms . . such Committee Member's Essential Patent Claims . . ."); *id*. at 31 (defining "Essential Patent Claims" as "[t]hose Patent claims the use of which would necessarily be infringed by the use, sale, offer for sale or other disposition of a portion of a product in order to be compliant with the required portions of a final approved JEDEC standard"). This is further confirmed by testimony of Samsung's JEDEC representative (and corporate representative in deposition on JEDEC), who testified that JEDEC does not obligate companies to disclose essential patents.

76.    Netlist did not deceive JEDEC or the industry by withdrawing or later rejoining JEDEC.

77.    Netlist has no leverage over manufacturers of standard-compliant products.

78.    Because a patent claim must be supported by the specification, Netlist did not use its membership in JEDEC committees to gather information about the technologies that would ultimately be incorporated into the JEDEC standards, file continuation applications on related patents and prosecute claims that allegedly read on the JEDEC standards, and then assert those purported SEPs against the industry. The USPTO issued Netlist patents because the concepts it

created were novel, non-obvious and properly disclosed. Netlist has not acquired any monopoly power by improperly obtaining patents for technologies that Netlist did not invent.

79. Netlist's lawful activities have not caused customers in any Relevant Markets, such as Samsung, or customers in the downstream market to face higher costs for access to HBM or related technologies. Rather, Samsung chose to breach the JDLA and willfully infringe Netlist's patents.

80. Any such claim is barred by the statute of limitations.

81. Samsung has no anti-trust standing and has not suffered anti-trust injury,

82. Accordingly, Netlist is entitled to a declaration that it has not violated the anti-trust laws.

83. Samsung cannot satisfy any of the elements for such a claim.

## VII. FOURTH CLAIM FOR RELIEF – Declaratory Judgment of No Attempted Monopolization in Violation of Section 2 of the Sherman Act, 15 U.S.C. § 2

84. Netlist re-alleges and incorporates by reference the allegations of the preceding paragraphs of this Complaint as if fully set forth herein.

Based on Samsung's established practice of alleging that Netlist has breached its RAND obligations and filing retaliatory claims on this basis, there exists a substantial controversy between Netlist and Samsung as to whether Netlist has engaged in attempted monopoliztion in violation of Section 2 of the Sherman Act.

85. Netlist denies that any Relevant Markets exist for anti-trust purposes.

86. To the extent any Relevant Markets exist, Netlist has not attempted to acquire or exploit market power in any Relevant Markets related to JEDEC-compliant DIMMs. Netlist and Samsung have repeatedly asserted that Netlist patents are not essential to any JEDEC Standard. Indeed, Samsung conceded in *EDTX I* that none of the patents-in-suit were standard essential.

EDTX I, Dkt. 427 (PTC Tr.), at 146:1-7, 192:22-24, and 193:6-10; *see also id.*, at 147:1-6 ("[The Court: there are no standard essential patents, there's no third-party beneficiary enforcement of a RAND obligation, and that largely negates the relevance of JEDEC."); *see also EDTX II*, Dkt. 818 at 2 (E.D. Tex. Nov. 6, 2024) ("The Parties stated on the record that … the ''608 Patent' … [is] not standard essential …."). As this Court further previously found, "[a]t the time of trial, Netlist asserted infringement based on a comparison of the claims of the asserted patents to Samsung's accused products," not the JEDEC standard. *EDTX I*, Dkt. 550, at 25. Nor are the claims of the '537 Patent essential to any JEDEC standard. Thus, Netlist could not have created a probability of excluding competition much less held power to charge supra-competitive prices. As a result, Netlist has not attempted to acquire or maintain any monopoly power as a result of Netlist's involvement in JEDEC.

87.     Netlist's conduct at JEDEC has not created any probability of achieving monopoly power. Netlist met any JEDEC disclosure duty that existed and did not fail to disclose its patents as essential or potentially essential to JEDEC committees. There is no obligation to disclose a patent that is not standard essential. JEDEC Manual No. 21T § 8.2.4 (". . . each Committee Member . . . agrees to offer to license on RAND terms . . such Committee Member's Essential Patent Claims . . ."); *id*. at 31 (defining "Essential Patent Claims" as "[t]hose Patent claims the use of which would necessarily be infringed by the use, sale, offer for sale or other disposition of a portion of a product in order to be compliant with the required portions of a final approved JEDEC standard"). This is further confirmed by testimony of Samsung's JEDEC representative (and corporate representative in deposition on JEDEC), who testified that JEDEC does not obligate companies to disclose essential patents.  Thus, Netlist has not attempted to acquire monopoly power through improper, exploitative means.

88.     Netlist has not attempted to exploit any market power by using its membership in JEDEC committees to gather information about the technologies that would ultimately be incorporated into the JEDEC standards, file continuation applications on related patents and prosecute claims that allegedly read on the JEDEC standards, and then assert those purported SEPs against the industry because patent claims are limited by the specification. The USPTO issued Netlist patents because the concepts it created were novel, not obvious, and properly disclosed. Netlist has not acquired any monopoly power by improperly obtaining patents for technologies that Netlist did not invent.

89.     Netlist's lawful activities have not caused customers in the Relevant Market, such as Samsung, or customers in the downstream market to face a dangerous probability of a distorted market, such as higher costs for access to DIMM technologies. Rather, Samsung chose to breach the JDLA and willfully infringe Netlist's patents.

90.     Samsung has no anti-trust standing and has not suffered anti-trust injury,

91.     Any such claim is barred by the statute of limitations.

92.     Accordingly, Netlist is entitled to a declaration that it has not attempted to monopolize the market for technologies covered by any JEDEC standard.

93.     Samsung cannot satisfy any of the elements for such a claim.

## VIII.  FIFTH CLAIM FOR RELIEF – Declaratory Judgment of No Unfair Competition Under Cal. Bus. & Prof. Code § 17200

94.     Netlist re-alleges and incorporates by reference the allegations of the preceding paragraphs of this First Amended Complaint as if fully set forth herein.

Based on Samsung's established practice of alleging that Netlist has breached its RAND obligations and filing retaliatory claims on this basis, there exists a substantial controversy between Netlist and Samsung as to whether Netlist has violated California's UCL.

95. Netlist has not engaged in any unfair competition under Cal. Bus. & Prof. Code § 17200, including (a) any unlawful business acts or practices in violation of Section 2 of the Sherman Act, (b) any unfair conduct by failing to disclose patents to JEDEC Committees or satisfying its RAND obligations, (c) obtaining its patents through improper derivation—claiming as its own the work of other JEDEC members, (d) knowingly asserting invalid patents in litigation against Samsung, or (e) seeking injunctive relief against Samsung for Samsung's infringement of Netlist's Patents.

96. Any such claim is barred by the statute of limitations.

97. Accordingly, Netlist is entitled to a declaration that it is not in violation of California Business & Professions Code § 17200.

98. Samsung cannot satisfy any of the elements for such a claim.

## IX. DEMAND FOR JURY TRIAL

99. Pursuant to Federal Rule of Civil Procedure 38(b), Netlist hereby demands a trial by jury on all issues triable to a jury.

## X. PRAYER FOR RELIEF

WHEREFORE, Netlist respectfully requests that this Court enter judgment in its favor ordering, finding, declaring, and/or awarding Netlist relief as follows:

A. that Defendants infringe the '537 Patent;

B. all equitable relief the Court deems just and proper as a result of Defendants' infringement;

C. an award of damages resulting from Defendants' acts of infringement in accordance with 35 U.S.C. § 284;

D. that Samsung's infringement of the '537 Patent is willful;

- 38 -

E.      a declaration that Netlist is not liable for breach of contract for the '537 Patent under JEDEC Patent Policy by demanding unreasonable and discriminatory royalties for a license to standard-essential patents;

F.      enhanced damages pursuant to 35 U.S.C. § 284;

G.      that this is an exceptional case and awarding Netlist its reasonable attorneys' fees pursuant to 35 U.S.C. § 285;

H.      an accounting for acts of infringement and supplemental damages, without limitation, prejudgment and post-judgment interest;

I.      in the alternative to an award of damages under 35 U.S.C. § 284, an order pursuant to 35 U.S.C. § 283 permanently enjoining Defendants, its distributors, officers, agents, servants, employees, attorneys, instrumentalities and those persons in privity, active concert or participation with them, from further acts of direct and/or indirect infringement of the '537 Patent including the manufacture, sale, offer for sale, importation and use of the infringing products; and

J.      such other equitable relief which may be requested and to which Netlist is entitled.

Dated: June 1, 2026                     Respectfully submitted,

*/s/ Jennifer Truelove*
Jason G. Sheasby
jsheasby@irell.com
H. Annita Zhong
azhong@irell.com
Andrew J. Strabone
astrabone@irell.com
Blair A. Silver
bsilver@irell.com
Michael W. Tezyan
mtezyan@irell.com
Andrew H. Henderson
dhenderson@irell.com
**IRELL & MANELLA LLP**
1800 Avenue of the Stars, Suite 900
Los Angeles, CA 90067

- 39 -

Tel. (310) 277-1010
Fax (310) 203-7199

Jennifer L. Truelove
Texas State Bar No. 24012906
jtruelove@mckoolsmith.com
**MCKOOL SMITH, P.C.**
104 East Houston Street Suite 300
Marshall, TX 75670
Telephone: (903) 923-9000
Facsimile: (903) 923-9099


*Attorneys for Plaintiff Netlist, Inc.*